**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-369 (JMC)** |
| **v.** | : | |
| | : | |
| **WILLIAM F. BEALS, II,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S REVISED SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant William F. Beals, II to eight months' incarceration. Although that sentence would exceed the Guidelines range, it would be justified by Beals's extensive criminal history that nevertheless resulted in an underrepresented criminal history category of I.  The government also requests that this Court impose one year of supervised release, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution and a $2,000 fine.

## I. Introduction

Defendant William Beals, a 53-year-old industrial cleaner and former Tennessee Valley Authority carpenter, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

1

Beals pleaded guilty to violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2). The government's recommendation is supported by Beals's (1) preparation for violence by wearing a protective vest, helmet, and gas mask at the Capitol; (2) aggressive verbal confrontation with police officers outside the Capitol building on January 6; (3) entrance into the Capitol Building via the Senate Wing Door shortly after the initial 2:13 p.m. breach; (4) multiple entries into the Capitol Building that day; (5) lies to the FBI and to the Probation Office about his involvement in the riot; (6) substantial and protracted criminal history, including lengthy prison sentences, that is not sufficiently represented by his Guidelines criminal history category; (7) advocacy for violence and other unlawful activity; (8) press interviews that disclaimed responsibility for his criminal conduct on January 6; and (9) belated expression of remorse for that criminal conduct.

The Court must also consider that Beals's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Beals's crime support a sentence of eight months incarceration in this case and one year of supervised release.

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 21, at ¶¶ 1- 7 (reference the Statement of Offense).

*Defendant Beal's Role in the January 6, 2021 Attack on the Capitol*

Beals traveled from his then-home in Tennessee on or about January 5, 2021, to Washington, DC.  On that day, he attended the rally at the Black Lives Matter Plaza to protest the certification of the Electoral College for the 2020 Presidential elections.  Beals wore a black vest and black helmet each adorned with yellow "Fuck Antifa" stickers, as shown in Figure 1 below. He also wore black leather gloves and a black leather jacket.  He armed himself with a baseball bat.



*Figure 1 - Beals in Washington DC on January 5, 2021*

3

The next day, after attending the former President's "Stop the Steal" rally on the Ellipse, Beals traveled down Pennsylvania Avenue towards the restricted Capitol grounds. He again wore the black gloves, black helmet, and black vest but this time his tactical vest was on top of a camouflage jacket instead of a black leather jacket as he had the night before. As he walked toward the Capitol, other rioters were pulling apart the bike rack barricades that cordoned off the restricted area. He then stood near a portion of the barricades that other rioters had cast aside. *See* Figures 2 and 3, below. Moments later Beals reached the Lower West Plaza area where police had formed a line to stop the advance of the mob.



Figure 2 - Beals (yellow box) on Lower Plaza | Figure 3 - Beals in the Lower West Plaza area where Capitol Police are lined up to prevent crowd advancement

Beals traveled to the Lower West Terrace area where he confronted officers of the United States Capitol Police (USCP). He alternately pushed against and resisted officers' efforts to maintain a barricade. Beals yelled at police officers, "Fuck you! I'll bet your mama's proud of your bitchass!"  *See* Figure 4 below.



*Figure 4 - Beals (in yellow circle) on Lower Plaza of the U.S. Capitol at 00:02 Exhibit 1*

At approximately 1:30 p.m., the rioters began to physically overtake the police line positioned outside the scaffolding and on the Northwest Steps, giving the rioters unfettered access

to the U.S. Capitol Building's Upper West Terrace. Beals climbed the scaffolding to make his way closer to the entrance as police officers fruitlessly tried to stop the rioters' advance. *See* Figures 5 to 7.



*Figure 5 - Beals (in yellow box) on scaffolding*



*Figure 6 - Beals (in yellow box) on scaffolding*



*Figure 7 - Beals (yellow box) on scaffolding and police officers protecting the Capitol (red circle)*

Beals subsequently made his way to the Northwest Courtyard near the Senate Wing. At approximately 2:13 p.m., the first rioters entered the U.S. Capitol Building at the Senate Wing Door. Minutes later, Beals entered the building through the Parliamentarian Door as shown in Figures 8 and 9. He walked around inside the Capitol Building for approximately eight minutes, posing for pictures, holding up signs, and speaking with other rioters.



*Figure 8 – Beals enters the NW Side Door*          *Figure 9 – Beals entry at the NW Side Door*

Beals left the Capitol building through the Senate Wing Door at approximately 2:20 p.m. *See* Figure 10 below.



*Figure 10 - Beals exiting from Senate Wing through a window*

The police secured the Senate Wing Door after the first breach on January 6. However, at approximately 2:45 p.m., a second rush of rioters breached that door a second time.   At approximately 2:48 pm, Beals donned a gas mask and re-entered the Capitol via the Senate Wing Door.  *See* Figures 12 and 13.  During his second entrance into the Capitol Building, Beals was inside for approximately five minutes.  He left through the Senate Wing Door.



*Figure 11 – Beals put on a gas mask before re-entering the Capitol*



*Figure 12 – Beals re-entered the via the Senate Wing Door*

8

After exiting the Capitol building the second time, Beals did not leave the restricted grounds. Rather, he joined a group of rioters on the eastern courtyards. They included Jacob Chansley, the infamous "QAnon Shaman," who was using a bullhorn to rile up the mob. Police officers were present nearby.



*Figure 13 – Beals with other protestors*



*Figure 13a – Close up of Beals's helmet*

Beals took at least one cellphone video after exiting the Capitol Building but while still in the restricted area. After exiting the Capitol, Beals recorded himself announcing on TikTok, "so we officially took the White House".



*Figure 14 –Beals's TikTok recording outside Capitol at 00:13 from Exhibit 2*

At some point that afternoon, Beals posed for photographs atop a USCP motorcycle on the Upper West Terrace.  *See* Figure 15.  He also took photos in two different areas outside the restricted grounds while posing with a USCP riot shield. *See* Figures 16 and 17.





*Figures 15, 16, & 17 - Beals sitting on USCP motorcycle and (in yellow box) with police shield with photo being taken by reporters and later by defendant Robert Gieswein.[2]*

---

[2] Robert Gieswein was indicted on January 27, 2021.  *See United States v. Gieswein*, Case No. 1:21-cr-00024 (TNM), ECF No. 3. Following a guilty plea to two counts of assault charged in the Second Superseding Indictment, Gieswein was sentenced to 48 months imprisonment, three years supervised release, and $2,000 in restitution. ECF No. 137 and 152.

*Beals's Text Messages with Three Percenters*

After the attack on the Capitol, Beals continued to communicate via text/instant messages with members of the Three Percenters, such as Derek Kinnison[3] and Robert Gieswein.[4] Significantly, in the wake of the January 6 riots, Beals did not express regret. Rather, he expressed his belief in the righteousness of his cause and challenged anyone who disagreed with his views. A few key messages were as follows:

Later on January 6, 2021, Beals texted to a rioter message group, "the police ended up getting my riot shield I made it 4 miles had a half mile to go and the bike cops rode up."

On January 7, 2021, Beals shared a recording from a third-party who livestreamed the events at the Capitol on January 6.  He then texted to a rioter message group, "it is our civic duty as III% ers to find him and to end his deep state game."[5]

On January 7, 2021, Beals texted to a message group, "the guy said it best in the video it was to take out trump they were bussed in to do what they did I knew it was to [sic] easy to get in it was hugely staged"

---

[3] Derek Kinnison was charged, along with five co-defendants, by indictment on June 9, 2021.  *See United States v. Alan Hostetter, et al.*, Case No. 1:21-cr-392-05 (RCL), ECF No. 1.  Kinnison was charged with violations of 18 U.S.C. §§ 1512(k)(Conspiracy to Obstruct an Official Proceeding), 1512(c)(2)(Obstruction of an Official Proceeding and Aiding and Abetting), 1752(a)(1) and (b)(1)(A)(Entering and Remaining in a Restricted Building and Grounds and Carrying a Deadly or Dangerous Weapon), 1752(a)(2) and (b)(1)(A)(Disorderly Conduct in a Restricted Building and Grounds, and 1512(c)(1)(Tampering with Documents or Proceedings).  A jury returned guilty verdicts on all counts against Kinnison and he was sentenced to 33 months imprisonment, 3 years supervised for Counts 1rss, 2rss, and 5rss and 12 months supervised release for Counts 3rss and 4rss. ECF No. 376 and 472.

[4] Based on FBI's investigation, it appears Beals met Gieswein and other Three Percenters on or about January 5, 2021 in Washington, DC at the Black Lives Matter Plaza.

[5] The FBI has been unable to determine who Beals is referring to in this text message. The text messages and message fragments were derived from the forensic extraction of mobile devices of other third-parties.

On January 11, 2021, Beals told the group, "to all brothers in arms the whole thing was a stage up pelosi laptop is in trumps hands the horned man is a marine set in motion to infiltrate antifa and to go deepstate apparently this has been in works for a while and the president has what he needs to take down deep state thank you god."

On January 11, 2021, Beals texted the group, "we need to understand that our country works for its patriots not against its patriots we are the front line and I can guarantee in the end the lefts game of employing antifa will be found and blm will also rest in piece my children can sleep at night knowing we the people will not stand and watch our country be divided based on race or whatever agenda the deep state and the left incorporate we are the last free nation it is our civic duty to keep it that way."

*Beals's FBI Interviews*

On July 13, 2021, FBI agents interviewed Beals in Chattanooga, Tennessee. During this interview, he admitted to being in Washington, DC on January 6, 2021. However, he falsely denied entering the U.S. Capitol Building. Beals also stated he met with a group that communicated via Facebook and Instagram on or about January 6, 2021.

On October 21, 2021, Beals was interviewed a second time by FBI agents in Chattanooga. At the time, Beals was employed on a contract basis as a carpenter at the Tennessee Valley Authority (TVA), a government-based electricity utility, and he had recently been informed that his security clearance as a TVA contractor had been revoked due to his actions on January 6, 2021. Beals initiated the second FBI interview because he wanted to know if his security clearance was revoked as a result of the FBI's earlier interview. The agents informed Beals that it is a crime to lie to federal agents during the course of an investigation. Beals replied he understood. The agents asked him again if he had entered the U.S. Capitol Building on January 6 and he again lied that he

had not.  The agents then showed him photographs of himself that contradicted that lie.  He replied that the photos must be fake or doctored.  When the agents pointed out to Beals his hand and neck tattoos in the photos, he stated that many people had the same tattoos and continued to deny entering the Capitol Building.

*Beals's News Media Interviews*

Both before and after his arrest, Beals gave interviews to members of the press in which he continued to deny entering the Capitol Building. When interviewed in June 2023 by a news outlet, Beals reportedly denied going inside the Capitol.[6] He falsely claimed he stayed outside and provided medical treatment to police and citizens. Beals gave another interview on August 31, 2023 with a reporter from WTVC.[7] *See* WTVC Interview (Government Exhibit 5 attached hereto). During the interview, Beals raised questions about the authenticity of photographs showing him inside the restricted area of the Capitol on January 6. In an interview published by the Chattanooga Times Free Press on September 2, 2023, Beals said he went to Washington, D.C. to find a pair of Black Lives Matter protesters from Atlanta.[8] *See* Chattanooga Times Free Press Article (Government Exhibit 6 attached hereto). He said he only went to the Capitol later in the day to administer first aid to a demonstrator. He also again lied that the photographs of him on January 6 had been doctored or faked.

---

[6] Revealed: Feds banned this violent J6er from nuclear plants — but they still haven't arrested him - Raw Story (attached hereto as Government Exhibit 4).
[7] Ringgold man charged in January 6th attack at U.S. Capitol signs plea agreement (newschannel9.com) (attached hereto as Government Exhibit 5).
[8] Ringgold man charged in connection with Jan. 6 breach at US Capitol | Chattanooga Times Free Press (attached hereto as Government Exhibit 6).

*The Charges and Plea Agreement*

Beals was arrested on August 24, 2023.  On October 24, 2023, the United States charged Beals by a five-count Information with violating 18 U.S.C. §§ 641, 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). On May 9, 2024, pursuant to a plea agreement, Beals pleaded guilty to Count One and Count Two of the Information, charging him with violations of 18 U.S.C. § 1752(a)(1) and (a)(2). By plea agreement, Beals agreed to pay $500 in restitution to the Architect of the Capitol.

*Beals's Post-Plea Interview*

On September 3, 2024, Beals participated in an interview with the government, as required by his plea agreement.  As part of the plea agreement, the parties agreed that information provided in this debrief would not be used for the purpose of determining the applicable guideline range— but did agree that information could be used for the purposes and in accordance with the terms identified in U.S.S.G. § 1B1.8(b).  Out of an abundance of caution,[9] the information provided by Beals will not be set forth in this revised sentencing memorandum, and the government asks the Court to disregard the information presented in the original sentencing memorandum filed on September 6, 2024 (ECF 32).  It should be noted, however, that Beals did participate in this interview and provided information consistent with the evidence, suggesting that he has accepted responsibility consistent with the plea agreement.

---

[9] Defense counsel suggested, in correspondence with the undersigned, that including this information in the September 6, 2024, sentencing memorandum constituted a breach of the plea agreement.  The government disagrees, and notes that the plea agreement restricts only the use of the defendant's debriefing information "conducted in anticipation of this agreement" would not be used at sentencing "for the purpose of determining the applicable guideline range."  ECF 20 at 9, ¶11. Nevertheless, to narrow the scope of any material disputes, the government respectfully submits this revised sentencing memorandum.

### III.      Statutory Penalties

Beals now faces a sentencing for violating 18 U.S.C. § 1752(a)(1) and 18 U.S.C. § (a)(2). As noted by the plea agreement and the U.S. Probation Office, Beals faces up to twelve months of imprisonment for each count and a fine of up to $100,000. 18 U.S.C. §§ 1752(b)(2), 3571(b). Beals must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.      The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.4(a)) | +10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Adjustment: Zero Point Offender (U.S.S.G. §4C1.1(a)(1)-(10) | <u>-2</u> |
| **Total Adjusted Offense Level** | **6** |

*See* PSR at ¶¶ 40-52.

The U.S. Probation Office calculated Beals's criminal history as a Category I. PSR at ¶ 75. This criminal history category underrepresents Beals's horrendous criminal history, which includes an astonishing 21 convictions as an adult.  PSR ¶¶ 54-74.  To discuss just a few, in 1991, Beals was charged in Payne County District Court Oklahoma with three offenses: Auto, Aircraft,

or Other Motor Vehicle, Attempt to Commit Larceny of Auto, Aircraft, or Motor Vehicle, and Grand Larceny.  PSR ¶ 55.  He pled guilty to all three counts.  He was sentenced to five years imprisonment as to Counts 1 and 3 and 2½ years imprisonment on Count 2.  *Id*.

Three years later, he was convicted of burglary and sentenced to 80 days in jail.  PSR ¶ 56. Following convictions for possession of stolen property, and vehicle prowling, PSR ¶ 57, Beals pleaded guilty in May 1995 to Taking a Motor Vehicle Without Permission and received a sentence of 5 months in jail and 12 months supervised probation. PSR ¶ 58.  By December 1995, Beals had another felony conviction for assault: he was sentenced to 48 months imprisonment and 24 months community supervision.  PSR ¶ 59.  Beals did not successfully complete his two-year period community supervision and was arrested for a probation violation in May 2003.  *Id*.

Beals's troubling conduct continued even after the events of January 6, although it is not reflected in his criminal history. In November 2022, Beals was identified as the suspect in a simple assault complaint in Chattanooga, Tennessee. The report stemmed from Beals's threatening language and actions after protesting a drag queen event at an area theater attended by members of the Patriot Front.[10]  According to the Chattanooga Police Department records, he allegedly threatened a supporter of the event while carrying a ball peen hammer. Beals posted statements targeting those he believed supported the theater event on social media accounts including Facebook and Instagram saying, the victim "almost got to kiss the end of my ball peen hammer why did he run".

---

[10] *See* Chattanooga Police Department Incident Report dated November 22, 2022 (attached hereto as Government Exhibit 8); *see generally*, Chattanooga drag brunch draws protesters | Chattanooga Times Free Press. *See also* Beals's November 13, 2022 online post referring to his threatened use of his ball peen hammer (attached hereto Government Exhibit 8.1). According to the Anti-Defamation League and the Southern Poverty Law Center, the Patriot Front is a white supremacist group.  *See e.g.*, https://www.adl.org/resources/hate-symbol/patriot-front and https://www.splcenter.org/fighting-hate/extremisst-files/group/patriot-front.

Additionally, the PSR's description of Beals's criminal history does not capture that in May 2022, a court ordered that, because of his disruptive and frightening actions toward others, Beals was prohibited from being at his daughter's school without advance authorization. *See* May 12, 2022 Letter to Beals (attached hereto as Exhibit 9). Beals got upset with the perceived presence of Black Lives Matter supporters at the school.  *See* May 24, 2022 Recorded Phone Calls with Beals by the Hamilton County Sheriff's Office (attached hereto as Government Exhibits 10 and 11).  He again returned to social media to post a photograph of the teacher's bumper sticker, which included the license plate of the teacher's car.

Beals has been a convicted felon since at least 1991 and thus prohibited from possessing firearms or ammunition. *See* PSR at ¶¶ 54-83; Beals Plea Agreement, ECF No. 20, at p. 4. Yet, during the execution of the search warrant at his Georgia home in this case in August 2023, the FBI recovered firearms and ammunition.  Beals has not yet been charged with a violation of 18 U.S.C. § 922(g) based on these facts. *See* Search Warrant Photographs dated August 24, 2023 (attached hereto as Government Exhibit 7).

The U.S. Probation Office calculated Beals's total adjusted offense level, after acceptance, at 6.  Because his atrocious criminal history did not result in any score under the Guidelines, his Guidelines imprisonment range is 0-6. PSR at ¶¶ 52, 133. Beals's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, the Court must consider the § 3553 factors in fashioning a just and appropriate sentence, and the Guidelines provide a starting point but not one that is dispositive amongst the several factors the court must balance. After determining the defendant's Guidelines range, a court then considers any departures or variances.  *See* U.S.S.G. § 1B1.1(a)-(c); U.S.S.G. § 1B1.1, cmt., background ("If, after step (c), the court imposes a sentence that is outside the guidelines

framework, such a sentence is considered a 'variance.'"). As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. Because the defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the Government respectfully requests that the Court impose a sentence above the top of the Guidelines range of eight months' incarceration.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

Sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of eight months' incarceration, 12 months of supervised release, 60 hours of community service, $500 in restitution, and a $2,000 fine.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Beals's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Beals, the absence of violent or destructive acts is not a mitigating factor. Had Beals engaged in such conduct, he would have faced additional criminal charges.

18

Nevertheless, it appears Beals prepared for a fight during his time in Washington, D.C. On the night of January 5, the day he seemed to have joined forces with other violent Three Percenters, Beals was seen carrying a baseball bat while protesting in and around the Black Lives Matter Plaza. The next day, Beals wore a gas mask, a helmet, gloves, camouflaged jacket underneath a protective vest, sunglasses, and neck gaiter, all of which obscured his identity at times, while he acted as a force multiplier.  He scaled the media tower and the inauguration stage scaffolding in clear contravention of the police force on display. Beals shouted aggressively at the police while impeding their efforts to enforce barricades. Beals was among the first wave of rioters who breached the Capitol through the Senate Parliamentarian Door.  He eventually headed towards the Crypt at a time when Congress was still in session.

Beals entered and exited the Capitol twice.  Beals's second entrance into the Capitol through the Senate Wing Door happened approximately 30 minutes after his first entrance in the same area.  When Beals entered the second time, it was as a result of the rioters physically overwhelming the scores of police assembled in the Senate Wing Door area who had worked to resecure the doors.  Unlike the first time he unlawfully entered, Beals wore a gas mask over his face. His actions were an implicit acknowledgement of the obviously illegal character of his presence inside the Capitol building.  He converted police property, a riot shield, to his own use. Beals's unlawful actions were broadcast on his TikTok account and by other third parties who filmed the rioters.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.  Beals's History and Characteristics**

One of the most important factors in Beals's case is his pervasive, unrepentant actions post-January 6th in light of his significant criminal history and self-proclaimed role as a member of the Three Percenters.  As noted in the PSR, Beals has a Three Percent flag tattoo on his neck. PSR at ¶¶ 100.  Though he denied having any social media accounts, PSR at ¶¶ 96, it appears this report to the Probation officer was false. Beals does have a known online presence, and his social media is inextricably intertwined with his professed Three Percenters membership.  *See* Figures 18-20 (Beals Facebook and Twitter pages).



*Figure 18 – Beals Facebook page containing picture of Beals in Three Percenter shirt and III% listed in Introduction.*



Figure 19                                          Figure 19a

Beal's text messages sent on and after January 6, 2021 to other now-convicted rioters who were also affiliated with the Three Percenters contained a III% reference.  His willingness - on January 6, 2021 and in political protests in each year since then - to cloak himself in Three Percenter regalia and join with its associates while behaving in dangerous and provocative ways creates a pattern that could be repeated in the future. Beals has given thought to instigating violence. Indeed, one media outlet quoted Beals as describing his approach to instigating violence: "most groups won't walk across the street and confront antifa…I do, and I do my best to get those retards going to cross the street on me because it's entertainment to me to knock a libtard out." *See* Government Exhibit 4 – Raw Story article Revealed: Feds Banned This Violent J6er From Nuclear Plants But They Still Haven't Arrested Him.

The United States Sentencing Guidelines score does not capture Beals's assault on democracy.  It was scored based on a trespass violation.  Thus, it is critically important for the sentence imposed to appropriately account for his history and characteristics.

As set forth in the PSR, Beals's criminal history includes convictions for Larceny, Burglary, Possession of Stolen Property, Assault, Harassing Communications, and several traffic

infractions. ECF 24 ¶¶ 54-83. He has arrests and convictions in the states of California, Washington, Oklahoma, Georgia, and Tennessee. Though Beals has at times successfully completed periods of supervised probation, he was arrested for violating his terms of probation for his felony Assault conviction in Washington. PSR ¶ 59. Beals has subsequently been sentenced to probation and fined up to $5,000 for other offenses. PSR ¶ 60.  On October 4, 2016, Beals was sentenced to 90 days in jail and fined $600 for his fifth Driving Without a License Third Degree offense.

Beals also reported having a diagnosis of Post-Traumatic Stress Disorder ("PTSD") and ADHD.  ECF 24 ¶ 103.  While Beals's mental health may impact him in ways not fully described by the PSR, it renders his conduct on January 6 all the more troubling. As someone who suffers from currently untreated PTSD, Beals has an obligation to take his prescribed medication and seek the appropriate treatment.   Moreover, his mental health status does not absolve him of responsibility for his voluntary decision to storm a guarded government building.

## C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The gravity of Beals' actions and his lengthy criminal history compel a sentence that will achieve a general deterrent effect. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide for specific deterrence weighs heavily in favor of a

serious term of incarceration.

In this case, Beals's conduct and lengthy history of non-compliance with the law demonstrates a very real need for specific deterrence in the form of incarceration. Beals did not accept the results of the 2020 presidential election, so on January 6 he dressed for violence, worked to thwart the police, invaded the Capitol, stole police property, and boasted about his intent to "take over the White House" and intimidate members of Congress. In the hours after the January 6 riot, he advocated in text messages for the civic duty owed by Three Percenters. Since then, he has been twice served no trespass warnings limiting his access to his former job site and to his minor daughter's school. Although his criminal history is dated in some respects, Beals's lengthy and serious criminal history in conjunction with his possession of firearms despite his status as a prohibited person also demonstrate the need for specific deterrence. With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Beals in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[11] This Court must sentence Beals based on his own

---

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. William Kit*, 1:22-CR-00376 (JMC), the defendant pled guilty to one count of Entering and Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1) and one count of Attempted Carrying a Pistol Without a License (Outside Home or Place of Business) in violation of 22 D.C. Code §§ 4504(a) and 1803. Kit livestreamed from the U.S. Capitol on January 6. He also angrily shouted at a police line assembled on the West Plaza. Kit eventually entered the Capitol building through the Senate Wing door but not until 2:57 PM. Once inside, he only stayed in the immediate vicinity for approximately four minutes.

In the aftermath of January 6, Kit posted multiple video recordings minimizing and mischaracterizing the day. When interviewed by the FBI, Kit admitted he went inside the Capitol. Kit had a Criminal History Category I based on minor traffic and drug paraphernalia crimes limited to when he was between the ages of 15 and 20. This court imposed a sentence of 30 days incarceration, 12 months supervised release, and 40 hours of community service.

Beals has significant aggravating factors that Kit does not, starting with his extensive criminal history, which establishes a much higher risk of recidivism. Unlike Kit, Beals was a self-proclaimed Three Percenter even before January 6, and continued his affiliation with extremist groups after January 6. Beals is even more of an outlier given his possession and use of riot gear

25

(e.g., gas mask, vest, helmet, gloves, etc.), and while there, he stole police equipment (though it was later recovered). And while Beals did not carry a firearm while in D.C., he had unlawful firearms and ammunition in his possession at his home, despite his multiple felony convictions.

In *United States v. Glen Mitchell Simon*, 1:21-CR-00346 (BAH), the defendant pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(2).  In imposing an eight-month sentence of incarceration, Judge Howell gave considerable weight to Simon's use of body armor: like Beal, Simon also wore a tactical vest to the Capitol on January 6. Simon caused physical contact with police officers when he joined other rioters attempting to overpower officers by pushing a metal barrier set up as a perimeter into them. Beals also confronted police early that afternoon as part of the first wave of rioters to breach the barricades at Peace Circle and descend on the outnumbered and overwhelmed U.S. Capitol Police on the West Plaza. Beals stared down the police line across a line of bike rack barricades, much like Simon.  And Beals's statements after the fact suggest an even more active encounter with the police than that captured on the known video footage.  As previously noted, after being at the Capitol on January 6, 2021, Beals texted, "I had to go back to hotel after the rubber bullets to the knee caps."  Beals's criminal history sets him apart from Simon, and his sentence should not be any less than the eight months in custody Simon received.  While Simon celebrated property destruction, Beals actually stole police property by taking the police riot shield.

In *United States v. Eric Cramer*, 1:22-CR-00339-01 (RDM), the defendant pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(2): Disorderly and Disruptive Conduct in a Restricted Building or Grounds.  Cramer prepared for violence by bringing a baseball bat, a police baton, and a facemask with respirator.  Cramer had two prior convictions: one for a 2004 assault on a family member and a 2014 conviction for illegal possession of wildlife.  Cramer also had additional

assault charges and protective order violations involving his family members (including his 15-year-old daughter), which were dismissed. Judge Moss sentenced Cramer to 8 months' incarceration and 12 months' supervised release. Beals's criminal history is far more extensive than Cramer's. Beals was recorded stating the circumstances under which he would disregard the no trespass warning issued by his daughter's school, which speaks to his continued willingness to ignore the rule of law. Consequently, Beals's case is one where the sentence should be similar to account for his past crimes and his conduct in this case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[12] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that BEALS must pay $500 in restitution, which reflects in part the role BEALS played in the riot on January 6.[13] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) BEALS's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 159.

---

[12] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[13] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VII.   Fine

Beals's convictions for violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2) subject him to a statutory maximum fine of $100,000 for Count One and $100,000 for Count Two. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Beals's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on Beals to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Beals has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $2,000 to $20,000. U.S.S.G. § 5E1.2(c).

Under § 5E1.2(d), courts shall consider:

(1) The need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2) Any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;

(3) The burden that the fine places on the defendant and his dependents relative to alternative punishments;

(4) Any restitution or reparation that the defendant has made or is obligated to make;

(5) Any collateral consequences of conviction including civil obligations arising from the defendant's conduct;

(6) Whether the defendant previously has been fined for a similar offense;

(7) The expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8) Any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d). *See* 18 U.S.C. § 3572(a).

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Beals to eight months' incarceration, 12 months of supervised release, 60 hours of community service, $500 in restitution, and a fine of $2,000. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Beals's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Cytheria D. Jernigan*
CYTHERIA D. JERNIGAN
Assistant United States Attorney
DC Bar No. 494742
Detailed to the U.S. Attorney's Office
for the District of Columbia
601 D. Street, N.W.
Washington, D.C. 20530
(318) 676-3611 (v)
Cytheria.Jernigan@usdoj.gov